1
2
3
4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

5
6

7    TIMOTHY D.,

8                               Plaintiff,          CASE NO. C18-5259-MAT

9         v.

10   NANCY A. BERRYHILL, Deputy          ORDER RE: SOCIAL SECURITY
     Commissioner of Social Security for   DISABILITY APPEAL
11   Operations,

12
                                Defendant.
13

14          Plaintiff proceeds through counsel in his appeal of a final decision of the Commissioner of

15   the Social Security Administration (Commissioner).    The Commissioner denied plaintiff's

16   application for Disability Insurance Benefits (DIB) after a hearing before an Administrative Law

17   Judge (ALJ). Having considered the ALJ's decision, the administrative record (AR), and all

18   memoranda of record, this matter is REMANDED for further administrative proceedings.

19                      **FACTS AND PROCEDURAL HISTORY**

20          Plaintiff was born on XXXX, 1963.[1]  He completed high school and previously worked as

21   a furniture upholsterer, quality control inspector, industrial cleaner, and hand packager.  (AR 48,

22   74-75.)

23   _____

        [1] Dates of birth must be redacted to the year.  Fed. R. Civ. P. 5.2(a)(2) and LCR 5.2(a)(1).

ORDER
PAGE - 1

Plaintiff protectively filed a DIB application in August 2014, alleging disability beginning February 18, 2010. (AR 162.) To receive DIB, plaintiff is required to establish disability on or prior to his December 31, 2015 "date last insured" (DLI). 20 C.F.R. §§ 404.131, 404.321. His application was denied initially and on reconsideration.

On April 21, 2016, ALJ James Sherry held a hearing, taking testimony from plaintiff and a vocational expert (VE). (AR 40-81.) On November 15, 2016, the ALJ issued a decision finding plaintiff not disabled from his alleged onset date through his DLI. (AR 18-32.)

Plaintiff timely appealed. The Appeals Council denied plaintiff's request for review on February 2, 2018 (AR 1-6), making the ALJ's decision the final decision of the Commissioner. Plaintiff appealed this final decision of the Commissioner to this Court.

**JURISDICTION**

The Court has jurisdiction to review the ALJ's decision pursuant to 42 U.S.C. § 405(g).

**DISCUSSION**

The Commissioner follows a five-step sequential evaluation process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520 (2000). At step one, it must be determined whether the claimant is gainfully employed. The ALJ found plaintiff had not engaged in substantial gainful activity since the alleged onset date. At step two, it must be determined whether a claimant suffers from a severe impairment. The ALJ found plaintiff's depressive disorder, attention deficit hyperactivity disorder (ADHD), pain disorder, and narcotics addiction severe. Step three asks whether a claimant's impairments meet or equal a listed impairment. The ALJ found plaintiff's impairments did not meet or equal the criteria of a listed impairment.

If a claimant's impairments do not meet or equal a listing, the Commissioner must assess residual functional capacity (RFC) and determine at step four whether the claimant has

demonstrated an inability to perform past relevant work.  The ALJ found plaintiff able to perform a full range of work at all exertional levels, but with the following nonexertional limitations: understand and remember simple job instructions, perform simple, routine, repetitive tasks, and tolerate occasional changes in the work setting; maintain attention and concentration for two-hour intervals to complete such tasks without more than normally expected brief interruptions; and could not tolerate any interaction with the public, but could tolerate brief and superficial interaction with coworkers and superficial interaction, including accepting instructions, from supervisors. With that assessment, the ALJ found plaintiff able to perform his past relevant work as an industrial cleaner and hand packager.

If a claimant demonstrates an inability to perform past relevant work, or has no past relevant work, the burden shifts to the Commissioner to demonstrate at step five that the claimant retains the capacity to make an adjustment to work that exists in significant levels in the national economy.  With the assistance of the VE, the ALJ found plaintiff capable of performing other jobs, such as work as a small products assembler and folder.

This Court's review of the ALJ's decision is limited to whether the decision is in accordance with the law and the findings supported by substantial evidence in the record as a whole. *See Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). *Accord Marsh v. Colvin*, 792 F.3d 1170, 1172 (9th Cir. 2015) ("We will set aside a denial of benefits only if the denial is unsupported by substantial evidence in the administrative record or is based on legal error.")  Substantial evidence means more than a scintilla, but less than a preponderance; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  If there is more than one rational interpretation, one of which supports the ALJ's decision, the Court must uphold that decision. *Thomas v. Barnhart*, 278

F.3d 947, 954 (9th Cir. 2002).

Plaintiff avers error at step two, in the failure to find him disabled, and in the evaluation of his RFC, past relevant work, and the VE's testimony. He requests remand for an award of benefits or, alternatively, further proceedings before a different ALJ. The Commissioner argues the decision has the support of substantial evidence and should be affirmed.

Step Two

At step two, a claimant must make a threshold showing his medically determinable impairments significantly limit his ability to perform basic work activities. *See Bowen v. Yuckert*, 482 U.S. 137, 145 (1987); 20 C.F.R. § 404.1520(c). An impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques, and established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by a statement of symptoms. 20 C.F.R. § 404.1521. *Accord* Social Security Ruling (SSR) 96-4p; *Ukolov v. Barnhart*, 420 F.3d 1002, 1005 (9th Cir. 2005). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1522(b). An ALJ is required to consider the "combined effect" of an individual's impairments in considering severity. *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual's ability to work.'" *Id*. (quoting SSR 85-28).

Plaintiff argues the ALJ erred at step two in finding a severe narcotics addiction and in failing to identify a severe impairment of carpal tunnel syndrome (CTS). The Court, for the reasons set forth below, finds this matter properly remanded for further administrative proceedings beginning at step two.

A.     Upper Left Extremity Pain

The record reflects the existence of bilateral CTS resulting from an April 2007 industrial injury, and an associated Department of Labor and Industries (L&I) claim. (*See, e.g.*, AR 325, 327, 339, 750.)  Dr. Douglas Hassan performed carpal tunnel release surgeries on plaintiff's left hand in February 2010 and on his right hand in March 2010.  (AR 58, 711-13.)  Plaintiff subsequently reported no problems on the right side, but symptoms including tenderness and pain in his left upper extremity, radiating from his hand/wrist to his elbow region. (*See, e.g.*, AR 342, 683.)  He engaged in hand rehabilitation therapy and a work hardening program, and received treatment, including pillar pain injections and narcotic pain medications from Dr. Hassan (AR 683-87, 691-94, 871-915), and from his primary care provider, Dr. Terrill Utt (AR 507-30, 726-39, 752-60).

In June 2010, Dr. Hassan described normal or otherwise mild MRI evidence and referred plaintiff for a consultation with Dr. Steven Litsky to address chronic pain conditions.  (AR 690-91.)  The July 2010 interdisciplinary pain rehabilitation evaluation by Dr. Litsky and others identified impairments including, *inter alia*, chronic pain syndrome, possible complex regional pain syndrome (CRPS), a condition also referred to as reflex sympathetic dystrophy syndrome (RSD), and a provisional diagnosis of psychological factors affecting a medical condition, including a severe somatic/pain focus, personality traits, pain-related anxiety, extreme pain avoidance behaviors, and general pain/stress coping limitations.  (AR 950-58.)  The evaluators concluded plaintiff was not a candidate for the pain management program, explaining: "[H]e would be asked to participate in physical activities that would likely significantly increase his symptoms, while weaning his use of opioid pain medications; this very experience of increased symptoms has been something that Mr. Drake has gone to great lengths to avoid."  (AR 953, 955.)

Plaintiff stated he could not increase his activity secondary to increase his pain, wanted biofeedback and psychology to deal with the changes and help with pain, but was not interested in increasing his strength and function.  (AR 957.)

In a September 2010 psychological evaluation, Dr. Edwin Hill identified a number of diagnoses, including pain disorder associated with psychological factors and chronic left hand pillar pain due to surgical treatment, concluded there appeared to be significant psychological factors contributing to the chronic pain complaints and a strong somatic focus on pain, and recommended psychotherapy and biofeedback. (AR 1033-39.)   A work capacity evaluation conducted the following month noted plaintiff's display of significant psychological issues regarding his pain symptoms and pain behaviors limiting him from full participation, found very low reliability of client report, did not include any formal recommendations regarding the ability to perform jobs, and recommended continued work with a psychologist using biofeedback techniques and intense counseling.  (AR 698-707.)[2]

In October 2010, Dr. Hassan noted recent nerve conduction studies were entirely normal, that plaintiff had had a three-phase bone scan, and that Dr. Hassan was not able to determine any anatomical cause for ongoing pain he could treat.  (AR 690-91, 709.)  He recommended plaintiff participate in a chronic pain management program to help cut down on his use of narcotics for pain.  (AR 709-10.)

Dr. Thomas Griffith conducted an independent medical examination (IME) associated with

---

[2] Plaintiff, on the first day of the evaluation, performed at highly competitive work levels with no objective limitation in the use of his left upper extremity for fingering, grasping, and range of motion and showed normal movement patterns and functional use of his left upper extremity in spite of subjective reporting of significant disabling pain, but, on the second day, declined to perform any testing.  (AR 704.) Plaintiff did not demonstrate any limitations with his left upper extremity on either day of the evaluation, and was observed grasping for his wallet, drinking water from a cup, pushing off with his wrists in an extended position, and engaging in symmetrical gesturing with both hands.  (AR 700.)

plaintiff's L&I claim for bilateral hands/wrists in March 2011. (AR 317-25.) Plaintiff reported no symptoms on the right side, and a chief complaint of pain and sensitivity on the left (AR 318.) Dr. Griffith found full range of motion of the shoulder, elbow, forearm, wrist, and hands bilaterally, with "just the slightest", but "not really measurable" asymmetry in wrist flexion and extension." (AR 323.) Tinel's signs were negative, plaintiff declined grip strength testing on the left, there was no evidence of hypersensitivity, some tenderness to deep firm palpation, no changes in sweat patterns, color, or warmth, and all ulnar and median innervated intrinsics of the hand worked normally, with full strength, though plaintiff tended "to give way a bit on the left side." (*Id.*) Dr. Griffith diagnosed, in pertinent part, status post bilateral carpal tunnel release, administratively accepted, and subjective complaints of severe left palm status post carpal tunnel release, with no objective findings. He found no restrictions on the right, but an impairment rating on the left premature, as the condition was not fixed and stable. (AR 324-25.) He stated plaintiff required further treatment for left palm pain, including an intensive course of hand therapy to desensitize the left hand, such as counter irritant therapy including a nerve stimulator, and the possibility of a response to a palm steroid injection. (AR 324.)

In a March 2011 psychiatric IME, Dr. Gary Hudak diagnosed pain disorder associated with both psychological factors and a general medical condition, major depressive disorder, and ADHD. (AR 327-37.) He found no mental health restrictions that would prevent plaintiff from returning to work, but a strong disability conviction and pain avoidance behavior as a barrier to returning to work or participating in vocational programs. (AR 335.) Individual psychotherapy and bio-feedback with pain psychologist Dr. Hill and psycho-pharmacologic management of depression and sleep disturbance had not rendered plaintiff amenable to participating in a multi-disciplinary pain management program, which would be the treatment of choice, plaintiff had reached

maximum medical improvement, and he could benefit from further psychiatric treatment, but it would be considered palliative, not curative.  (AR 336.)

Beginning in March 2011, Dr. Utt identified RSD as a diagnosis.  (*See id.*)  In August 2011, upon referral by Dr. Utt, examining physician Dr. Jerry Huang found no abnormalities in left wrist x-rays, unremarkable MRI and bone scans from 2010, and no explanation for pain following carpal tunnel release.  (AR 721-22.)  Plaintiff received pain management treatment from Dr. Scott Havsy between June 2012 and April 2013 (AR 765-80, 1061-1102), and from Dr. Ross Vogelgesang between October 2012 and October 2013 (AR 263-68, 301-16, 1106-19), and treatment from various other medical sources, such as ARNP Erin Henderson.

The observations, diagnoses, and assessments as to the nature of plaintiff's condition varied over the course of his treatment.  Dr. Havsy, in June 2012, assessed borderline findings of CRPS, observed "a lot of oversomatization" (AR 1098-99), and, in a September 2012 letter, stated plaintiff was being treated for CRPS, found "a significant amount of psychological overlay" and the prognosis for recovery poor, and recommended intensive psychotherapy (AR 1087).  Dr. Vogelgesang initially noted complaints of pain consistent with CRPS, but with minimal physical examination findings only positive for hypoesthesia. (AR 1119.)  However, in March 2013, while finding relatively well-maintained muscle bulk on the left compared to the right, relatively good finger movement, good flexion, good extension, and no significant decreased range of motion at the elbow or shoulder joint, Dr. Vogelgesang also identified symptoms "very consistent with" and "highly suspicious" for CRPS, including hypoesthesia across the left hand and wrist, some swelling on the left compared to the right due to cautious movement more than anything else, and some mild edema with lots of rugae across the fingertips, cool to the touch and hypoesthetic.  (AR 316.)  He recommended a stellate ganglion block and spinal cord stimulator as treatment options.

In April 2013, ARNP Henderson similarly assessed "highly suspicious" for CRPS. (AR 258, 1105.) Records associated with psychological examinations and treatment included pain disorder diagnoses. (*See, e.g.*, AR 946-49 (Dr. Jeffrey Okey, in November 2011, identified a current working diagnosis of pain disorder associated with both psychological factors and a general medical condition); AR 960-63 (Dr. Hill, in October 2012, identified pain disorder associated with psychological factors and chronic left hand RSD/CRPS pain); and AR 1283-1313 (treating psychiatrist Dr. Patric Darby, in 2013 and 2014, included working diagnoses of both chronic pain and CRPS).)

A June 2014 IME tasked Dr. D. Casey Jones with addressing whether plaintiff had a physical condition in addition to the already accepted bilateral CTS and, specifically, determining whether plaintiff met the criteria for CRPS.[3] (AR 339, 364-65.) On examination, Dr. Jones found some very mild and equivocal mottling of the left upper extremity, but detected no temperature difference, evidence of atrophy, sudomotor changes, different sweat patterns, or skin or nail trophic changes on the right or left; found bilaterally full, symmetrical, and normal flexion, extension, abduction, and adduction of the elbows, wrists, and thumbs, and full and normal extension and total active flexion of all eight lesser digits; negative Tinel testing on the right, but no testing on the left at plaintiff's request; found negative carpal compression for residual carpal tunnel issues bilaterally, good thenar bulk bilaterally, and two-point discrimination of four millimeters or better in all ten digits; and was able to palpate both the radial and ulnar pulse on the left. (AR 359-61.)

_____

[3] The IME identified the CRPS criteria as either (a) at least four of the following objective examination findings: hyperalgesia or allodynia; edema; vasomotor changes such as asymmetry or instability; sudomotor changes, such as excess perspiration in an affected extremity; trophic changes, such as shiny skin, or hair, or abnormal hair growth; or findings suggestive of impaired motor function, such as tremor, abnormal limb positioning; or diffuse weakness that cannot be explained by neurologic loss or by dysfunctions of joints, ligaments, tendons, or muscles; or (b) a diagnostic three-phase bone scan showing a characteristic pattern of abnormality (which may substitute for the four or more listed objective findings). (AR 364-65.)

Dr. Jones found plaintiff did not meet the CRPS criteria and diagnosed intractable left upper extremity pain of unclear etiology, not meeting the diagnostic criteria for CRPS. He opined: "Based on clinically objective findings, there is no basis for restricting [plaintiff] in any way, non-occupationally or occupationally. . . . His findings with respect to [CRPS] are actually quite minimal." (AR 361, 365.)

Dr. Mark Koenen conducted a psychiatric IME in July 2014. (AR 370-96). He diagnosed a history of depressive disorder, not otherwise specified, and likely opiate dependence. (AR 385.) Dr. Koenen noted plaintiff claimed to be depressed, reported some improvement in mood symptoms, did not appear subjectively depressed, and attributed his depression to physical problems, while numerous evaluations found no objective findings and numerous inconsistencies in plaintiff's presentation and alleged symptoms. (AR 385.) Dr. Koenen found more concerning the fact plaintiff was "taking large doses of narcotics for a condition that appears to have no objective evidence of physical pathology[,]" deemed opiate dependence likely, noted continued marijuana use, found it uncertain whether plaintiff met abuse or dependence criteria, and observed plaintiff had also been "prescribed large quantities of stimulants over the years, although the indication for this is questionable." (AR 385-86.) Dr. Koenen assessed no work restrictions, no psychiatric treatment required for any condition related to the industrial injury, and no psychiatric condition related to the injury on a more probable than not basis. (AR 386-87.)

On forms requesting diagnostic imaging dated in September and October 2014, Dr. Thomas Young, a naturopathic doctor and chiropractor,[4] stated plaintiff had a left carpal tunnel release that went very badly, resulting in "marked RSD-like left arm pain and supersensitivity[.]"

---

[4] The ALJ mistakenly identified Dr. Young as an "M.D." (AR 22). (*See, e.g.*, AR 590 ("Thomas Young, ND DC PS[,] Diplomate Physiotherapy").)

(AR 787-88.) Dr. Young also, in a letter dated October 1, 2014, outlined his disagreement with the conclusions of Drs. Jones and Koenen (AR 588-90), and on a separate form stated plaintiff "[v]ery poorly tolerates any motion of the left arm" (AR 596). Dr. Young further stated plaintiff "has a severe, disabling condition that is causally related to the post surgical sequela[,]" agreed findings were negative for CTS, and further agreed plaintiff "does not present with a textbook classical [RSD] even though the super-sensitivity is characteristic of [RSD]." (AR 589.) Both Dr. Jones and Dr. Koenen submitted responsive letters, critical of the opinions of Dr. Young. (AR 1215-21.) Dr. Koenen suggests evidence of malingering (AR 1216-18), while Dr. Jones reiterates his conclusion plaintiff does not meet the criteria for CRPS, and contends Dr. Young's opinion "appears to be heavily weighted toward his social/moral perception of [plaintiff], rather than toward discernible, objective, clinical findings." (AR 1220.)

Pointing to the objective findings and other medical evidence in the record, the opinions of Dr. Griffith, Dr. Jones, Dr. Havsey, and the State agency medical consultants, and considering the criteria for the evaluation of CRPS symptoms set forth in SSR 03-2p, the ALJ found plaintiff's upper-extremity conditions and CRPS were non-severe impairments prior to the DLI. (AR 20-23 (record citations omitted).) He afforded the opinions of Dr. Young little weight.

Considering the evidence as a whole, the ALJ's conclusion plaintiff did not have severe CTS within the relevant time period has the support of substantial evidence. There does not, in fact, appear to be a dispute from any medical examiners or providers on this point, including Dr. Young (*see* AR 589). However, as related to other possible conditions associated with plaintiff's left upper extremity pain or perception of pain, the Court finds a need for further consideration at step two and beyond.

The ALJ, as an initial matter, appears to have overlooked evidence from Dr. Young. The

ALJ addresses statements made on diagnostic imaging forms, finds little evidence regarding the extent of the treatment relationship and an absence of clarity as to how long it lasted or how often he saw plaintiff, and finds no objective basis noted for the conclusion reached or clear explanation of any resulting specific function-by-function work-related limitations. (AR 22-23.) However, the record does contain treatment notes from this medical source, dated between September 2014 and March 2015. (*See* AR 580-652, 1322-55.) The records include Dr. Young's statement in October 2014 that plaintiff needed a neurologist to help establish CRPS (AR 612), his January 2015 observation of continued "RSD-like pain" (AR 646), and observations of marked symptoms, worse with activities of daily living, in February and March 2015 (AR 652, 1322).

The ALJ also failed to address the conflict presented in the letters from Drs. Young, Jones, and Koenen. The ALJ notes that the December 2014 letters from Dr. Jones and Dr. Koenen recapped their earlier reports and opinions, and that Dr. Koenen "felt the claimant was unwittingly making a case for malingering," which Dr. Koenen suggested "may have been because the claimant did not like his former job." (AR 22, 27.) Dr. Koenen, in fact, states that Dr. Young made a case for malingering. (*But see* AR 588-90, 1215-18 (mistakenly referring to Thomas Young as "Dr. Thomas" at some points).)

Other aspects of the ALJ's consideration of CRPS are problematic. The ALJ, for example, observed that Dr. Havsy found plaintiff's pain appeared disproportionate to any inciting event. (AR 22, 1098.) As the cited record from Dr. Havsy shows, such a finding forms a portion of the diagnosis of CRPS, but must be accompanied by other findings, which Dr. Havsy found to be borderline. (AR 1098.) Also, while accepting his conclusion, the ALJ did not discuss the findings of Dr. Jones or the nature of his examination and opinion regarding CRPS. The ALJ equated the findings and diagnoses of Dr. Jones and Dr. Griffith, the latter of whom addressed CTS, not CRPS.

In addition, and as reflected above, there are a large number of other medical records discussing CRPS or possible CRPS symptoms, observations, and treatment recommendations, only some of which the ALJ addresses in the decision. While the ALJ need not discuss each piece of evidence in the record, *see Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984), in this case, a more detailed discussion of the medical record is warranted.

As the Commissioner observes, step two serves merely as a threshold determination to screen out weak claims: "It is not meant to identify the impairments that should be taken into account when determining the RFC." *Buck v. Berryhill*, 869 F.3d 1040, 1048-49 (9th Cir. 2017). In determining RFC, the ALJ must consider all of a claimant's limitations and restrictions imposed by all impairments, even those not found severe. *Id.* (citing SSR 96-8p). In this case, the ALJ identified severe impairments, including a pain disorder, and continued the evaluation beyond step two. However, as discussed below, the ALJ's subsequent analysis of plaintiff's impairments and assessment of symptom testimony and the RFC does not render the step two errors harmless.

In sum, the ALJ's apparent failure to consider Dr. Young's treatment records, the failure to address the conflict contained in the letters from Drs. Jones, Koenen, and Young, the minimal analysis of the evidence from Dr. Jones, and the abbreviated discussion of medical records associated with plaintiff's symptoms and treatment warrant further consideration of CRPS at step two and beyond. On remand, plaintiff should be referred to a physician qualified in the diagnosis and treatment of CRPS. The physician should report on whether or not plaintiff has CRPS and, if finding plaintiff has the impairment, make treatment recommendations and opine with regard to any functional limitations. The ALJ should thereafter conduct the sequential analysis addressing CRPS at both step two and step four.

/ / /

B.    Narcotics Addiction

Plaintiff notes the absence of any formal diagnosis of a narcotics addiction or any analysis by the ALJ classifying a particular substance use disorder.  He contends the ALJ's finding is against the vast weight of the medical evidence.  He also argues the inclusion of a severe narcotics addiction had the potential for subsequent prejudicial effect, with the need to determine whether drug addiction or alcoholism (DAA) is a contributing factor material to a disability determination pursuant to 20 C.F.R. § 404.1535.[5]

The record contains evidence associated with at least a possible narcotics addiction.  Dr. Jones included probable narcotics addiction as a diagnosis (AR 360-61), while Dr. Koenen identified likely opiate dependence as a diagnosis, finding the use of large doses of narcotics concerning, but the question of whether plaintiff met abuse or dependence criteria uncertain (AR 385-86).  In September 2014, treating psychiatrist Dr. J. Daniel Wanwig indicated plaintiff was dependent on opiate pain medication because of his ongoing severe and chronic pain, but was not abusing the medication.  (AR 473.)  (*See also* AR 1172 (February 13, 2014 from Alliance Pain Center including diagnosis of long term drug use).)

Records from 2012 show plaintiff's agitation when Dr. Havsy reduced the amount of a prescribed muscle relaxant (AR 1089), that plaintiff became irate with Dr. Havsy for not providing him with enough medication, and that Dr. Havsy suggested plaintiff find another doctor (AR

_____

[5] A claimant is not entitled to disability benefits "if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C).  Where relevant, an ALJ must conduct a DAA analysis and determine whether a claimant's disabling limitations remain absent the use of drugs or alcohol. 20 C.F.R. §§ 404.1535, 416.935.  The ALJ must, first, identify disability under the five-step procedure and, second, conduct a DAA analysis to determine whether substance abuse was material to disability. *Bustamante v. Massanari*, 262 F.3d 949, 955 (9th Cir. 2001).  "If the remaining limitations would still be disabling, then the claimant's [DAA] is not a contributing factor material to his disability. If the remaining limitations would not be disabling, then the claimant's substance abuse is material and benefits must be denied." *Parra v. Astrue*, 481 F.3d 742, 747-48 (9th Cir. 2007).

1077).  In February 2014, plaintiff had a positive drug screen showing oxycodone, morphine, clonazepam, THC, and amphetamine, which violated his pain contract and led to his discharge from care with Dr. Vogelgesang.  (AR 290-95.)  In January 2015, plaintiff was angry about having to see a pain specialist, felt Dr. Darby should be able to prescribe him opiates without such an evaluation, and "now denies being kicked out of previous pain doctors."  (AR 536; *see also* AR 538 (Dr. Darby also told plaintiff he would not "do mail order for Opiates."))

Even if the ALJ erred in finding the existence of a severe narcotics addiction, plaintiff fails to show harm.  An ALJ's error may be deemed harmless where it is "'inconsequential to the ultimate nondisability determination.'" *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (cited sources omitted).  The Court looks to "the record as a whole to determine whether the error alters the outcome of the case." *Id*.  The party asserting error bears the burden of demonstrating "not only the error, but also that it affected his 'substantial rights,' which is to say, not merely his procedural rights." *Ludwig v. Astrue*, 681 F.3d 1047, 1053 (9th Cir. 2012).

Plaintiff's assertion of harm is no more than speculative.  He points to the potential for prejudice through a DAA materiality determination.  Because the ALJ did not find plaintiff disabled with consideration of a severe narcotics addiction, he did not consider whether plaintiff would still be disabled if he stopped using narcotics.  In the absence of a showing the severity determination altered the outcome in this case, any error at step two is properly deemed harmless.  However, because this matter is subject to remand for other reasons, the ALJ should reconsider the evidence associated with a narcotics addiction and, as may be needed, provide an explanation of the basis for a similar conclusion and include a DAA analysis.

Pain Disorder/Step Four

At step four, the ALJ outlined plaintiff's allegations regarding his pain and mental

impairments, and found his statements as to the intensity, persistence, and limiting effects of symptoms not consistent with the medical and other evidence in the record. The ALJ provided a lengthy description of medical records and the opinions of psychologists and psychiatrists following in-person examinations, as outlined below.

In July 2010, as a part of the interdisciplinary evaluation conducted with Dr. Litsky, Dr. Sarah Sherrard noted plaintiff may have limited insight into his conditions, and diagnosed psychological factors affecting a medical condition. (AR 26, 950-58.) She assessed a Global Assessment of Functioning (GAF) score of 51-55, which the ALJ construed as indicating plaintiff likely would have been able to maintain full-time employment on a regular and continuing basis prior to the DLI.[6] In September 2010, Dr. Hill found plaintiff oriented and engaged, but depressed and somatically focused, diagnosed pain disorder associated with psychological factors due to significant upper extremity conditions, and assessed a GAF of 52, suggesting plaintiff would have been able to maintain employment. (AR 26, 1033-39.)

In March 2011, Dr. Hudak found plaintiff depressed and anxious, but with main concerns about his upper extremity pain, oriented, with intact insight and judgment, and able to recall objects and interpret common proverbs. (AR 26-27, 327-37.) He diagnosed pain disorder associated with psychological factors due to a general medical condition, and assessed a GAF of 55, indicating the ability to maintain employment. In November 2011, Dr. Okey found plaintiff mildly restless, anxious, nervous, and distracted, diagnosed pain disorder associated with psychological factors

---

[6] The most recent version of the Diagnostic and Statistical Manual of Mental Disorders (DSM) does not include a GAF rating for assessment of mental disorders. DSM-V at 16-17 (5th ed. 2013). According to an earlier version of the DSM, a GAF between 41 and 50 describes "serious symptoms" or "any serious impairment in social, occupational, or school functioning"; 51 and 60 describes "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning"; and 61 and 70 describes "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning . . . , but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (4th ed. 2000). This explanation should be referred to whenever GAF scores are referenced.

and a general medical condition, found plaintiff had been subjectively benefiting from therapy, and assessed a GAF as high as 50, indicating the ability to maintain employment. (AR 27, 946-49.)

Plaintiff received psychiatric treatment from Dr. Wanwig from 2011 to 2014. (AR 27.) As described by the ALJ, Dr. Wanwig initially noted a variety of symptoms, developed since plaintiff's upper extremity surgeries, but subsequently observed improvement, clear mental status examinations, the helpfulness of medications, mild symptoms alternating with periods of stability, and a much improved attitude. (*Id*. (citing records contained at AR 1187-1213).) At one point, plaintiff "admitted he had not been working due to his industrial injury, not because of his mental health impairment." (AR 27.)

Dr. Koenen, in July 2014, found plaintiff with good eye contact, cooperative, goal-directed, and with full range of affect, diagnosed a history of depressive disorder, and assessed a GAF of 70, firmly suggesting plaintiff would have been able to maintain full-time employment on a regular and continuing basis. (AR 27, 370-96.) Dr. Koenen also, in December 2014, recapped his earlier opinion and raised the issue of malingering. (AR 1215-18.)

The ALJ also noted that, in 2014 and 2015, plaintiff attended counseling sessions with Dr. Darby. (AR 28.) As described by the ALJ, many of plaintiff's complaints concerned his upper extremity impairment, not his mental health. Plaintiff also expressed anger about having to see a pain specialist in order to continue receiving opiate medication, and at one point reported he had never used oxycodone, despite blood tests showing such use. (*Id*. (citing AR 304, 762, 791, 1170).)

In assessing the evidence at step four, the ALJ stated that, throughout the period at issue, plaintiff continually focused on his upper extremity pain symptoms, even during mental health evaluations. (AR 28.) While the record contained diagnoses of CRPS, depression, and pain

disorder, multiple examining physicians noted plaintiff's pain disorder was "associated with psychological factors due to a general medical condition." (*Id.*) "In other words, it was the claimant's physical pain that caused his mental health conditions. The claimant admitted as much, continuously saying he could not work because of his upper extremity conditions, and the inability to work . . . caused anxiety when people would ask what his job was." (*Id.*) The ALJ reasoned:

> The undersigned recognizes that a determination of cause and effect is important in order to figure out whether the claimant's mental health impairments cause him to be disabled. If the claimant's mental health impairments cause work-related limitations, then the claimant may have a legitimate claim that he is disabled due to his mental health impairments. However, that does not seem to be the case here. Instead, the medical evidence reflects that it was the claimant's physical pain that caused him to be unable to work, which was the claimant's allegation to every medical and psychological examiner. The fact that he was not working is what caused him to feel depressed and anxious. This means the claimant's mental health impairments were not the cause of his work-related limitations, but the effect that those limitations had on the claimant's psyche. Because it was the claimant's physical pain that limited his ability to work prior to the [DLI], and because those physical symptoms have a limited objective basis of support, the undersigned concludes the medical evidence does not support a finding of disability.

(*Id.*)

The ALJ concluded the RFC contained the work-related limitations best supported by the medical evidence and opinions in the record. He accorded significant weight to the opinions of examining physicians Drs. Sherrard, Hill, Hudak, and Okey, and significant weight to the non-examining State agency psychological consultants Drs. Bruce Eather and Dan Donahue.

Plaintiff argues the ALJ erred in finding his mental health impairments are not disabling. He maintains the failure to identify CTS as a severe impairment impacted the remainder of the decision, in that both his pain and depression stemmed from CTS surgery. (*See* AR 690-95, 946-

99.) He contends the ALJ improperly segregated his impairments, rather than considering them in combination. He also raises generalized objections to the ALJ's conclusions. Plaintiff states, for example, that while the decision suggests his depression is linked to his inability to work, there is no indication a return to work with his current pain symptoms would offer any improvement, and that he experiences significant pain in his everyday life, resulting in difficulty gripping objects and using the computer, which causes depression affecting his concentration and memory, and ability to socialize and care for his family and himself.

Plaintiff does not demonstrate error in the failure to identify CTS as a severe impairment or that this omission impacted the decision. However, the ALJ's errors in relation to CRPS evidence necessarily require further consideration of plaintiff's claims at step two and beyond, including further consideration of a pain disorder and any limitations and restrictions imposed by all of plaintiff's impairments.

Nor does the Court otherwise find the ALJ's consideration of the evidence of a pain disorder or overall step four analysis to withstand scrutiny. At step two, the ALJ failed to specify or elaborate as to the evidence relied on in the identification of a severe pain disorder. The ALJ also erred, at step four, in addressing the evidence associated with a pain disorder and other impairments.

The ALJ did not adequately address all significant and probative medical evidence in assessing plaintiff's RFC. For example, the ALJ states multiple examining doctors identified a pain disorder "associated with psychological factors due to a general medication condition." (AR 28.) Yet, Drs. Okey and Hill diagnosed a pain disorder associated with both psychological factors and a general medication condition. (*See, e.g.*, AR 946-49, 960-63, 1038.) Dr. Hill also discussed problems associated with pre-existing ADHD and personality traits/rule-out personality disorder.

(*See id.*)  Dr. Sherrard identified psychological factors affecting a medical condition, including a severe somatic/pain focus, personality traits, pain-related anxiety, pain avoidance behaviors, and general pain/stress coping limitations.   (AR 953, 955.)   Dr. Havsy identified significant oversomatization and psychological overlay.  (AR 1087, 1098-99.)

The ALJ also simultaneously discounts plaintiff's symptom reporting, while relying on his reporting to show his functional limitations stemmed only from physical, not mental impairments, and that his depression and anxiety were merely an effect, not a cause of his inability to work.  (AR 28.)  It is, moreover, not entirely clear whether the ALJ relies on any basis for discounting plaintiff's symptom testimony other than inconsistency with the medical evidence. (*See* AR 25-29.)

The ALJ's step four reasoning is also problematic in a larger sense.  The ALJ finds no severe physical impairment and multiple severe mental impairments, but no limitations in light of the limited objective support for plaintiff's physical symptoms.  Because he must consider all impairments, whether or not severe, the ALJ properly considered the absence of objective support for physical symptoms and any associated limitations.  However, the reliance on the absence of objective evidence of physical impairment in association with a severe pain disorder or any other mental health impairment was misplaced.  While there does not appear to be any medical opinion of work-related limitations associated with a pain disorder or any other impairment, the ALJ should have addressed significant, probative evidence associated with a psychological pain disorder, or other mental health impairment, whatever plaintiff's own symptom reporting reflected.

On remand, the ALJ should also refer plaintiff to a doctor qualified in the diagnosis and treatment of pain disorders of a psychological nature.  The doctor should report on whether or not plaintiff has such a condition and, as may be necessary, make treatment recommendations and

opine with regard to any functional limitations. The ALJ should reassess plaintiff's claim with consideration of this and the other medical evidence of record at step two and beyond.

<u>Other Alleged Errors</u>

Plaintiff raises a number of arguments addressing the RFC assessment, past relevant work, and VE testimony. As explained by the Commissioner, and set forth in well-established law, these arguments lack merit. However, because this matter requires further consideration beginning at step two, the ALJ will need to reconsider the evidence in assessing plaintiff's RFC and in reaching conclusions at steps four and five. In addition, plaintiff does not identify and the Court does not find any reason this matter should be assigned to a different ALJ on remand.

## **<u>CONCLUSION</u>**

For the reasons set forth above, this matter is REMANDED for further proceedings.

DATED this <u>10th</u> day of January, 2019.

Mary Alice Theiler
United States Magistrate Judge

ORDER
PAGE - 21